## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

|  |  |
|---|---|
| CRESCENT PLAZA HOTEL OWNER, L.P., individually and on behalf of all others similarly situated, | Civil Action No. _____ |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| ZURICH AMERICAN INSURANCE COMPANY, | |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiff Crescent Plaza Hotel Owner, L.P. ("Crescent"), individually and on behalf of the other members of the below-defined worldwide class (collectively, the "Class"), brings this class action against Defendant Zurich American Insurance Company ("Zurich"), and in support thereof states the following:

### I.     NATURE OF THE ACTION

1.      Plaintiff Crescent owns The Ritz-Carlton, Dallas, a five-star hotel located on downtown Dallas' prominent McKinney Avenue. The Ritz-Carlton is a destination for Texas locals as much as visitors. The hotel is home to Fearing's Restaurant, which serves Southwestern cuisine by celebrity chef Dean Fearing as well as signature drinks at the Rattlesnake Bar, and hosts afternoon tea in the Lobby Lounge. The hotel also offers a salon, a luxurious spa, and a large 24-hour fitness center open to both guests and residents. The hotel has an outdoor swimming pool, guest rooms and suites, and 19,000 square-feet of meeting and event space, including various

popular wedding venues. The Ritz-Carlton, Dallas has been welcoming guests since 2007. Its existence, however, is now threatened by the Coronavirus and the associated disease, COVID-19.[1]

2.      Ritz-Carlton is an iconic brand in the luxury properties portfolio of Marriott International, Inc. ("Marriott"), based in Bethesda, Maryland. Marriott is the largest hotel operator in the world. At year-end 2019, Marriott had 2,144 company-operated properties (584,879 rooms), which included properties under long-term management or lease agreements with property owners (management and lease agreements together, "Operating Agreements"), and as well as 5,205 franchised and licensed properties (796,042 rooms).

3.      Crescent owns the Ritz-Carlton, Dallas, and Marriott operates the hotel under the terms of an Operating Agreement with Crescent.

4.      For the policy period April 1, 2019, through April 1, 2020, Zurich issued Property Insurance Policy No. PPR 3700638-17 to Marriott (the "Zurich Policy," the "Policy" or the "2019 to 2020 Policy").

5.      Marriott is the Named Insured for the Policy, along with:

> … any subsidiary, associated or allied company, corporation, firm, organization, and Marriott International, Inc.'s interest in any partnership or joint venture in which Marriot International, Inc. has management control or ownership as now constituted or hereafter is acquired, as the respective interest of each may appear, all hereafter referred to as the "Insured," including legal representatives.
>
> Further, at the option of Marriott International, Inc., the interests of third-party franchisees and licensees as respects franchised hotel locations shall also be covered under this policy subject to the terms and condition specified herein.

6.      Zurich also issued an insurance policy to Marriott for the period April 1, 2020, to April 1, 2021 (the "2020 to 2021 Policy") on substantially similar terms. To the extent any losses of Plaintiff or the other Class Members are not covered under the 2019 to 2020 Policy because of

---

[1] SARS-CoV-2 or the Coronavirus is also sometimes referred to by the name of the disease which it causes and that spreads it, COVID-19. For ease of reference, we refer to the virus as COVID-19 throughout, unless specifically stated otherwise.

the timing of the loss, or are otherwise found to not be covered in whole or in part by the 2019 to 2020 Policy, the Class seeks coverage for those losses under the 2020 to 2021 Policy, based on this Class Action Complaint.

7.     The Territory of the Policy is defined as "Insured Locations worldwide, except for loss or damage in the following countries: Cuba, Iran, Iraq, Kampuchea (Cambodia) and North Korea or any other country where trade relations are unlawful as determined by the Government of the United States of America."

8.     The coverages under the Policy "apply to an Insured Location in the policy Territory unless otherwise provided." Insured Locations include locations "listed on a schedule on file" with Zurich. The Ritz-Carlton, Dallas is an Insured Location under the Policy.

9.     Unless otherwise excluded in the Policy, the Policy insures Real Property, Personal Property, and Guest Property "located at an Insured Location or within 1,000 feet thereof, to the extent of the interest of the Insured in such property." Real Property includes "new buildings and additions under construction at an Insured Location, in which the Insured has an insurable interest, including where the insured is under legal or contractual obligation to keep insured for direct physical loss or damage."

10.     Under the Policy, "loss or damage arising out of one OCCURRENCE shall mean the sum of all loss or damage insured against, irrespective of the number of locations involved, arising out of or caused by any one disaster, loss or series of disasters, accidents or losses arising out of one event."

11.     Crescent required "all risk" property coverage to protect itself in the event that the Ritz-Carlton, Dallas suddenly had to suspend operations for reasons outside of the hotel's control, or if the hotel had to act in order to prevent further property damage. Crescent obtained this coverage as an Additional Insured under the Policy, which provides Property Damage (Section B) and Time Element (Section C) coverage.

12.     The Property Damage coverage in Section B of the Policy includes "Protection and Preservation of Property" coverage to pay the costs of actions taken due to actual "insured direct

3

physical loss or damage" to Covered Property, or of actions necessary to "prevent immediately imminent" "insured direct physical loss or damage" to Covered Property. Policy § B.4.V.

13.     The Time Element coverage in Section C of the Policy provides at least six "Time Element Coverages," including: (i) "Business Interruption," for loss due to the "suspension of business operations or services, and (ii) "Extra Expense," for costs incurred in order to temporarily continue business "as nearly normal as practicable."

14.     The Time Element coverage in Section C of the Policy also provides at least 15 "Time Element Coverage Extensions," including: (i) "Interruption by Civil and Military Authority," for losses sustained when access "is impaired by order or action of civil or military authority," (ii) "Ingress/Egress," for losses and costs "due to impairment of ingress to or egress from an Insured Location," and (iii) "Cancellation of Bookings," for losses due to "the cancellation of, and/or inability to accept bookings or reservations" as the direct result of, among other reasons, "outbreak of contagious and/or infectious disease as well as restrictive guidance or travel advisories placed on a region or area" by the Centers for Disease Control and Prevention ("CDC"), the World Health Organization ("WHO") or other "comparable authority."

15.     The Policy also provides "Time Element Coverage Extensions" for "Walked Guests" and "Guest Rebates," for costs to relocate guests to another hotel, or for "goodwill payments and/or refunds," due to "direct physical loss or damage" to property.

16.     The "Time Element Coverage Extensions" in the Policy also provide "Protection and Preservation of Property" coverage for losses incurred "in taking reasonable action for the temporary protection and preservation of property" that is "necessary to prevent imminent direct physical loss or damage" to property. This coverage at Section C.3.G is an addition to the "Protection and Preservation of Property" coverage at Section B.4.V in the Property Damage section of the Policy.

17.     The language and structure of the Policy confer not only the protection of "Time Element Coverages" but also the *extended* protection of "Time Element Coverage Extensions," which add to, supplement, or extend the "Time Element Coverages." The "Time Element

4

Coverage Extensions" are not "Time Element Coverage Replacements and Limitations," and do not replace or limit the "Time Element Coverages." For illustration, the "Time Element Coverages" for "Business Interruption" and "Extra Expense" provide a base of coverage that is *extended* by (and not replaced or limited by) all responsive "Time Element Coverage Extensions" such as for, *e.g.*, "Cancellation of Bookings" or "Walked Guests."

18.     The Time Element coverages in Section C of the Policy also include Zurich's separate promise to pay costs reasonably and necessarily incurred by Insureds to reduce their Time Element losses.  Policy § C.1.C.

19.     Unlike many policies that provide Business Interruption and other Time Element coverages or Time Element coverage extensions, the Policy does not include, and is not subject to, any exclusion for losses caused by the spread of viruses or communicable diseases.

20.     Zurich purports to have added a "Communicable Disease Endorsement" to the 2020-2021 Policy.  The Endorsement reflects Zurich's apparent attempt to exclude coverage for losses arising out of transmission of a virus for 2020-2021, and Zurich's implicit admission that there is no virus exclusion for 2019-2020.  The Endorsement is not present in the 2019-2020 Policy and therefore has no application to claims under the 2019-2020 Policy.

21.     The Ritz-Carlton, Dallas suffered a physical loss of property due to COVID-19 and was forced to suspend or reduce business, and to incur expenses, to reduce Time Element losses due to COVID-19 and the resultant Closure Orders (defined below) issued by civil authorities in Texas.

22.     Upon information and belief, Zurich has, on a widescale and uniform basis, refused to pay claims for losses and costs due to COVID-19 and the resultant Closure Orders covered by the Property Damage and Time Element coverages identified in this Class Action Complaint. Indeed, Zurich has repudiated coverage for Plaintiff's claim under the Policy.

## II.     JURISDICTION AND VENUE

23.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because Defendant and at least one member of the Class are citizens of different states and because: (a) the

Class consists of at least 100 members; (b) the amount in controversy exceeds $5,000,000 exclusive of interest and costs; and (c) no relevant exceptions apply to this claim.

24.     Venue is proper in this District under 28 U.S.C. § 1391 because Defendant resides in this District and a substantial portion of the acts and conduct giving rise to the claims occurred within the District.

## III.     THE PARTIES

### *Plaintiff*

25.     Plaintiff Crescent is a Limited Partnership organized under the laws of Delaware, with its principal place of business in Fort Worth, Texas.  Crescent owns The Ritz-Carlton, Dallas in Dallas, Texas, and is an Additional Insured under the Policy.

### *Defendant*

26.     Defendant Zurich is an insurance company organized under the laws of the State of New York, with its principal place of business in Schaumburg, Illinois.

## IV.     FACTUAL BACKGROUND

### A.     *The Zurich Policy*

27.     In return for the payment of a premium, Zurich issued Policy No. PPR 3700638-17 to Marriott for a policy period of April 1, 2019, through April 1, 2020, under which Plaintiff is an Additional Insured.  Policy No. PPR 3700638-17 is attached hereto as Exhibit 1 (redactions in Exhibit 1 were made by Zurich).  The Class has performed all of their obligations under Policy No. PPR 3700638-17, including Marriott's payment of premiums.  The Covered Property, with respect to Plaintiff, is The Ritz-Carlton, Dallas, located at 2121 McKinney Avenue, Dallas, Texas 75201.

28.     The Policy provides that: "Additional insured interests are automatically added to this Policy as their interest may appear when named as Additional Insureds ….  Such interests become effective on the date shown in the Certificate of Insurance and will not amend, extend or alter the terms, conditions, provisions and limits of this Policy."  Policy § E.1.

6

29.     Zurich has acknowledged in written communications with Plaintiff that Plaintiff is an Additional Insured.  Additional Insureds are covered by the Property Damage coverages in Section B of the Policy and the Time Element coverages in Section C of the Policy.

30.     In many parts of the world, property insurance is sold on a specific peril basis.  Such policies cover a risk of loss if that risk of loss is specifically listed (*e.g.*, hurricane, earthquake, H1N1, etc.).  Most property policies sold in the United States, however, including those sold by Zurich, are all-risk property damage policies.  These types of policies cover all risks of loss except for risks that are expressly and specifically excluded.

31.     The Property Declarations for the Policy state: "Insurance provided under this policy applies to loss or damage caused by or resulting from risks of direct physical loss of or damage from any external cause to covered property occurring at a premises described within the Territory of the policy, unless excluded."

32.     Under the heading "Perils Insured Against," Zurich agreed to cover against, and to pay for, "all risks of direct physical loss" to Covered Property, except as excluded.

33.     Zurich did not exclude or limit coverage for losses from the spread of virus in the 2019-2020 Policy, but included a defective attempt to do so for 2020-2021 that, in any event, has no application to claims under the 2019-2020 Policy.

34.     As a matter of practice, Zurich writes a virus exclusion (even if defective) into an insurance policy when it intends to impose or enforce a virus exclusion.  Zurich Group CFO George Quinn told reporters on May 14, 2020 that Zurich's business interruption coverage "wording typically includes a virus exclusion" in the U.S., and that "[m]ore than 99% of our contracts in North America will have that wording."[2]

35.     The Policy contains a "Biological or Chemical Materials Exclusion" for "actual or threatened malicious use of pathogenic or poisonous biological or chemical materials."  Policy

---

[2] L.S. Howard, Zurich Insurance Estimates Coronavirus Pandemic Claims to Hit $750 Million for 2020, Insurance Journal (May 14, 2020),
https://www.insurancejournal.com/news/international/2020/05/14/568567.htm.  All Internet websites cited in this Class Action Complaint were last visited June 3, 2020.

End. 3. Community spread of COVID-19, however, is neither "use" nor "malicious use," and COVID-19 is not within the meaning of "pathogenic or poisonous biological or chemical materials."

36.     Losses due to COVID-19 are "Perils Insured Against" under the Policy.

37.     In the Policy, Zurich agreed to pay for reasonable and necessary costs to "temporarily protect or preserve" Covered Property. Policy § B.4.V. Recoverable costs include costs for actions due to actual "insured direct physical loss or damage" to Covered Property. Recoverable costs also include costs to "prevent immediately imminent" "insured direct physical loss or damage" to Covered Property.  COVID-19 caused actual "insured direct physical loss or damage." COVID-19 also threatened "immediately imminent" "insured direct physical loss or damage."

38.     In the Policy, Zurich also agreed to pay for actual Business Interruption losses sustained by Plaintiff and the other Class Members due to the "suspension of business operations or services" during the "Period of Liability" caused by direct physical loss or damage.  Policy § C.2.A. Business Interruption coverage applies when the Insured is "wholly or partially prevented from producing goods or continuing business operations or services" at the Covered Property.  The "Period of Liability" is the length of time "starting from the time of direct physical loss or damage of the type insured against" and ending when the property can be "repaired or replaced and made ready for operations under the same or equivalent physical and operating conditions that existed prior to the damage."  Policy § C.4.

39.     A recoverable Business Interruption loss, for which Zurich agreed to pay Plaintiff and the other Class Members, is "Net Profit, before deducting income taxes, which is not earned as a direct result of the interruption of production or suspension of business operations or services," plus ongoing Fixed Charges and Ordinary Payroll incurred. Policy § C.2.A.

40.     The presence of virus or disease can constitute physical damage to property, as the insurance industry has recognized since at least 2006.  When preparing so-called "virus" exclusions to be placed in some policies, but not others, the insurance industry drafting arm, The

Insurance Services Office ("ISO"), circulated a statement to state insurance regulators that included the following:

> Disease-causing agents may render a product impure (change its quality or substance), or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property. When disease-causing viral or bacterial contamination occurs, potential claims involve the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses. Although building and personal property could arguably become contaminated (often temporarily) by such viruses and bacteria, the nature of the property itself would have a bearing on whether there is actual property damage. An allegation of property damage may be a point of disagreement in a particular case.

41.     Zurich Group CFO George Quinn's May 14, 2020 statements to reporters about the prevalence of virus exclusions in 99% of Zurich contracts in North America leaves no doubt that Zurich understood that policyholders expect the full benefit of their Property Damage and Time Element coverages absent a virus exclusion.

42.     As described below, due to the presence of COVID-19, Covered Property suffered physical loss or damage. Due to COVID-19, Covered Property also became unsafe for its intended purpose and thus suffered physical loss or damage for that reason as well. The business functions of Covered Property were impaired as a result. If Class Members continued to conduct business as usual, the virus would manifest, and guests, employees, and other visitors to Covered Property would risk infection and serious illness or death. This is not a non-physical or remote loss such as one occasioned by a breach of contract, loss of a market, or the imposition of a governmental penalty. Instead, it is a direct physical loss because of the changed physical environment.

43.     Zurich also agreed to pay reasonable and necessary Extra Expense that Plaintiff and the other Class Members incur during the "Period of Liability" that they would not have incurred if there had been no direct physical loss or damage to the Covered Property. "Extra Expense" includes "expenses to temporarily continue as nearly normal as practicable the conduct of the Insured's business." Policy § C.2.B.

9

44.     Zurich also agreed to pay for the costs incurred by Plaintiff and the other Class Members "due to impairment of ingress to or egress from an Insured Location," for up to a 90 day period.  This Ingress/Egress coverage applies whether or not the Covered Property is damaged, "provided that such impairment is a direct result of direct physical damage of the type" insured by the Policy.  Policy § C.3.D.

45.     Zurich also agreed to pay for losses incurred by Plaintiff and the other Class Members for a 365 day period due to "the cancellation of, and/or inability to accept bookings or reservations" as the direct result of, among other reasons, an "outbreak of contagious and/or infectious disease as well as restrictive guidance or travel advisories placed on a region or area" by the CDC, WHO, or other "comparable authority" within "a radius of 5 miles of an Insured Location."  Policy § C.3.E.  This "Cancellation of Bookings" coverage for losses caused by the outbreak of a contagious or infectious disease *extends* the base protection of "Time Element Coverages" for Business Interruption and Extra Expense and applies in addition to other responsive "Time Element Coverage Extensions."

46.     Zurich also agreed to pay Plaintiff and the other Class Members for losses incurred "in taking reasonable action for the temporary protection and preservation of property" "necessary to prevent imminent direct physical loss or damage" to property. Policy § C.3.G. By its express terms, this "Protection and Preservation of Property" coverage is not limited to actual direct physical loss or damage to property, but rather applies to imminent loss or damage.

47.     Zurich also agreed to pay for losses sustained by Plaintiff and the other Class Members when access to Covered Property "is impaired by order or action of civil or military authority" for up to a 90 day period.  Policy § C.3.K.

48.     Zurich also agreed to provide "Walked Guests" coverage, to repay Plaintiff and the other Class Members for the costs of relocating guests to another hotel due to "direct physical loss or damage" to property.  Policy § C.3.L.  In addition, Zurich agreed to provide "Guest Rebate" coverage for costs incurred for "goodwill payments and/or refunds" made due to "direct physical loss or damage" to property.  Policy § C.3.M.

10

49.     Each of the responsive "Time Element Coverage Extensions" in Section C of the Policy apply in addition to the relevant Property Damage coverage under Section B and the standard "Time Element Coverages" for Business Interruption and Extra Expense under Section C. Losses caused by the presence of the Coronavirus and the associated disease COVID-19 are covered by Section B, including the Protection and Preservation of Property coverage, and Section C.2, including Business Interruption and Extra Expense coverage. That base coverage is ***extended*** by, and not replaced or limited by, the responsive "Time Element Coverage Extensions" in Section C, including coverage for Cancellation of Bookings and Civil Authority coverage for the Closure Orders.

50.     The Policy also separately "covers expenses reasonably and necessarily incurred by the Insured to reduce the loss otherwise payable" for Time Element coverage and Time Element coverage extensions. Policy § C.1.C. In this Class Action Complaint, these expenses are sought in the same Count as, but separately from and in addition to, Protection and Preservation of Property losses.

51.     Losses caused by COVID-19 and the related orders issued by local, state, and federal authorities therefore trigger separate coverage under several separate, independent coverage sections: the Property Damage coverage in Section B.4.V for Protection and Preservation of Property; the Time Element Coverages in Section C.2 of the Policy for Business Interruption and Extra Expense; and the Time Element Coverage Extensions in Section C.3 of the Policy for Interruption by Civil and Military Authority, Ingress/Egress, Cancellation of Bookings, Walked Guests, Guest Rebates, and Protection and Preservation of Property. Plaintiff and the other members of the Class also reasonably and necessarily incurred expenses to reduce their Time Element losses under Section C.1.C.

## B.      *The Covered Cause of Loss*

52.     The presence of COVID-19 has caused civil authorities across the United States and throughout the world to issue orders requiring the suspension or restriction of business at a

11

wide range of establishments, including civil authorities with jurisdiction over the Ritz-Carlton, Dallas and the properties of the other Class Members (the "Closure Orders").

### 1. The COVID-19 Pandemic

53.     According to the CDC, "COVID-19 is caused by a coronavirus called SARS-CoV-2. Coronaviruses are a large family of viruses that are common in people and [many] different species of animals, including camels, cattle, cats, and bats.  Rarely, animal coronaviruses can infect people and then spread between people."[3]  "The virus that causes COVID-19 is thought to spread mainly from person to person, mainly through respiratory droplets produced when an infected person coughs or sneezes. These droplets can land in the mouths or noses of people who are nearby or possibly be inhaled into the lungs. Spread is more likely when people are in close contact with one another (within about 6 feet)."[4]

54.     "It may be possible that a person can get COVID-19 by touching a surface or object that has the virus on it and then touching their own mouth, nose, or possibly their eyes."[5]  A scientific study investigating the stability of COVID-19 in different environmental conditions found that, following COVID-19 contamination, the virus could be detected hours later for tissues and paper, days later for wood, cloth and glass, or even a week later for stainless steel and plastic.[6]

55.     The CDC advised travelers:

> CDC recommends you stay home as much as possible and avoid close contact, especially if you are at higher risk of severe illness. Staying in temporary accommodations (hotels, motels, and rental properties) may

---

[3] *Coronavirus Disease 2019 Basics*, https://www.cdc.gov/coronavirus/2019-ncov/faq.html#Coronavirus-Disease-2019-Basics.

[4] *Id.*

[5] *Coronavirus Disease 2019, How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html.

[6] *See* Alex W.H. Chin, et al., Stability of SARS-CoV-2 in different environmental conditions, The Lancet Microbe (April 2, 2020), https://doi.org/10.1016/S2666-5247(20)30003-3.

expose you to the virus through person-to-person contact and possibly through contact with contaminated surfaces and objects.[7]

The CDC advised businesses to "[u]se videoconferencing or teleconferencing when possible for work-related meetings and gatherings," and to "[c]ancel, adjust, or postpone large work-related meetings or gatherings that can only occur in-person in accordance with state and local regulations and guidance."[8]

56.    In a Risk Topics alert, Zurich warned its policyholders worldwide about the dangers of COVID-19 at their properties.  "Workers can be infected by contacting contaminated surfaces or objects and then touching their eyes, nose or mouth."[9]  Citing a study published by the New England Journal of Medicine, Zurich explained in its Risk Topics alert that COVID-19 can remain in the air up to 3 hours, and has the following surface times:

- On copper: Up to 4 hours
- On cardboard: Up to 24 hours
- On plastic: 2 to 3 days
- On stainless steel: 2 to 3 days.[10]

57.    There is sustained transmission of COVID-19 on six continents.  The United States has reported the most cases and deaths, with cases in all 50 states.

### 2.    The Dallas County and Texas Closure Orders

58.    Effective March 21, 2020, Dallas County prohibited in-restaurant dining and closed gyms, fitness centers, and spas.[11]  Effective March 24, 2020, Dallas County ordered all individuals living within the County to "shelter at their place of residence," and closed all but Essential

---

[7]  *Coronavirus Disease 2019, Considerations for Travelers – Coronavirus in the US,* https://www.cdc.gov/coronavirus/2019-ncov/travelers/travel-in-the-us.html.

[8] *Coronavirus Disease 2019, Interim Guidance for Businesses and Employers Responding to Coronavirus Disease 2019 (COVID-19),* (May 2020),

https://www.cdc.gov/coronavirus/2019-ncov/community/guidance-business-response.html.

[9] Zurich, Risk Topics, Disinfecting Offices and Facilities During the COVID-19 Crisis (May 2020), https://www.zurichna.com/-/media/project/zwp/zna/docs/riskeng/covid/zurich-risk-topic-cleaning-and-disinfecting-during-covid-19-outbreak.pdf?la=en&hash=F0638733CD4D60108E821C13AEFEC325.

[10] *Id.*

[11] Amend. Order of Dallas County Judge Clay Jenkins (March 21, 2020).

Businesses.[12]  Hotels were designated Essential Businesses for lodging and delivery or carry-out food services, but, "[t]o the greatest extent possible," were required to comply with Social Distancing Rules, "including maintaining six feet social distancing for both employees and the general public."  These rules continued at least through April 23, 2020, at which time modifications for the limited reopening of some business became effective through May 15, 2020.[13]

59.     On March 19, 2020, the State of Texas issued an Executive Order, in accordance with CDC guidelines, that "every person in Texas shall avoid gathering in groups of more than 10 people," and that people shall avoid eating or drinking at bars and restaurants as well as visiting gyms.[14]  This Order was effective as of March 20, 2020 and was set to continue through April 3, 2020.[15]

60.     On March 26, 2020, the State of Texas issued an Executive Order imposing a mandatory 14-day self-quarantine on travelers flying to Texas from New York, New Jersey, Connecticut, or the City of New Orleans.[16] This Order was effective on March 28, 2020 and was set to continue indefinitely.[17]  Effective March 30, 2020, and also to continue indefinitely, the State of Texas expanded the self-quarantine ban to travelers driving to Texas from Louisiana.[18]

61.     On March 31, 2020, the State of Texas, in accordance with guidance from the Commissioner of the Texas Department of State Health Services ("DSHS"), and to reduce the spread of COVID-19, required that "every person in Texas shall, except where necessary to provide or obtain essential services, minimize social gatherings and minimize in-person contact with people who are not in the same household."[19]

---

[12] Amend. Order of Dallas County Judge Clay Jenkins (March 24, 2020).

[13] Amend. Order of Dallas County Judge Clay Jenkins (April 23, 2020).

[14] Tex. Exec. Order No. GA-08 (March 19, 2020).

[15] Id.

[16] Tex. Exec. Order No. GA-11 (March 26, 2020).

[17] Id.

[18] Id.

[19] Tex. Exec. Order No. GA-14 (March 31, 2020).

62. On April 17 and 27, 2020, the State of Texas issued Executive Orders allowing for reopening of certain retail services.[20]

63. Closure Orders were also issued by Texas' neighboring states of Louisiana, New Mexico, and Oklahoma.[21]

64. The Closure Orders were issued in response to the rapid spread of COVID-19.

65. Violations of the Dallas County and State of Texas Closure Orders were punishable by fine, imprisonment, or both until May 7, 2020. On May 7, 2002, the State of Texas retroactively eliminated confinement as a punishment for violations after a Dallas salon owner began serving a jail sentence for disregarding orders to keep her salon closed.

### 3. Closure Orders Throughout the United States and World

66. Closure Orders were also issued by local, state, provincial or national jurisdictions of Class Members throughout the United States and the world. A non-comprehensive list, for illustration, includes the following states and countries where Class Members have Covered Properties:

- California, Connecticut, Florida, Georgia, Illinois, New Jersey, New York, Pennsylvania and Virginia; and

- Argentina, Australia, Brazil, Canada, England, France, Germany, India, Israel, Italy, Mexico, New Zealand, Poland, Qatar, Singapore, South Africa, Spain, Switzerland, Thailand, Netherlands and Venezuela.[22]

67. A major news outlet reported that, as of April 3, 2020, over 3.9 billion people had been asked or ordered to stay at home, from over 90 countries or territories.[23]

---

[20] Tex. Exec. Order No. GA-16 (April 17, 2020); Tex. Exec. Order No. GA-18 (April 27, 2020).

[21] La. Exec. Order No. 33 JBE 2020 (March 23, 2020); N.M. Public Health Emergency Order (March 23, 2020); Okla. Exec. Order No. 2020-07 (April 1, 2020).

[22] *See also* the non-comprehensive list at Exhibit 2.

[23] Alasdair Sandford, Coronavirus: Half of humanity now on lockdown as 90 countries call for confinement, EuroNews (April 3, 2020), https://www.euronews.com/2020/04/02/coronavirus-in-europe-spain-s-death-toll-hits-10-000-after-record-950-new-deaths-in-24-hou.

68.     Of the ten cities most visited in 2019 (Bangkok, Paris, London, Dubai, Singapore, Kuala Lumpur, New York City, Istanbul, Tokyo and Antalya),[24] only Tokyo is within a country that did not implement any sort of stay-at-home protection order (and Japan declared a national state of emergency and restricted entry from a list of over 90 countries). Class Members have Covered Properties in all of these cities except for Antalya.

69.     The New York Times chronicled the plight of the W Hotel in Barcelona. The 27-story, 472-room beachfront hotel, affectionately known as "The Sail," sat empty for months because of COVID-19 but required ongoing maintenance to prevent further loss and damage.[25] Daniel Ordoñez, living at the hotel to perform maintenance, adjusts "the curtains and lighting in some rooms to create a giant heart on the hotel's façade," in tribute to essential workers fighting COVID-19 in hospitals and health centers. Thus, the sleek luxury hotel with jaw-dropping views of Barcelona's revolutionary architecture and endless Mediterranean beaches was rendered unfit for business service by COVID-19 but served as a light upon the path to a better day.

### 4.     The Impact of COVID-19 and the Closure Orders

70.     The presence of COVID-19 caused direct physical loss or damage to Plaintiff's and the other Class Members' Covered Property, by impairing and damaging the property, and by causing a "suspension of business operations or services" during a "Period of Liability."

71.     Plaintiff and the other Class Members also incurred reasonable and necessary costs to "temporarily protect or preserve" Covered Property as a result of actual "immediately imminent" "insured direct physical loss or damage" to Covered Property caused by COVID-19. Plaintiff and the Class also incurred reasonable and necessary costs to "temporarily protect or preserve" Covered Property in order to *prevent* "immediately imminent" "insured direct physical loss or damage" to Covered Property caused by COVID-19.

---

[24] Allison Millington, The 19 Most Visited Cities Around the World in 2019, Business Insider (September 5, 2019), https://www.businessinsider.com/most-visited-cities-around-the-world-ranked-2019-9.

[25] Raphael Minder, Wandering a Grand Hotel Emptied by Coronavirus, and Checking 1,400 Taps, The New York Times (May 17, 2020), https://www.nytimes.com/2020/05/17/world/europe/barcelona-hotel-coronavirus.html.

72.    The Closure Orders, including the issuance of Dallas County and State of Texas Closure Orders, resulted from Perils Insured Against and caused losses by impairing access to and business functions of Plaintiff's and the other Class Members' Covered Property.

73.    Upon information and belief, Class Members have had confirmed cases of COVID-19 at Covered Properties and have had to take action to secure and preserve those Covered Properties. As of the filing of this Class Action Complaint, Plaintiff estimates that Class Members have suffered several hundreds of millions of dollars of Business Interruption losses alone. These losses are ongoing and could increase substantially depending on the length and ultimate severity of the pandemic and the government response in countries around the world.

74.    On May 11, 2020, Marriott reported its financial results for the first quarter of 2020, which ended on March 31, 2020 ("1Q20"). President and Chief Executive Officer Arne M. Sorenson said, "In the last few months we have seen the impact of COVID-19 spread throughout our business in an unprecedented way." Sorenson reported that Revenue per Available Room ("RevPAR") fell sharply as the pandemic spread "and, in April, worldwide RevPAR declined approximately 90 percent." Sorenson stated that "roughly a quarter" of Marriott hotels were closed as of May 11, 2020. Sorenson also disclosed "extremely low levels of demand." Based on occupancy and booking trends, Sorenson noted that demand outside of China "has stabilized, albeit at very low levels." Accentuating the meager positive, Sorenson highlighted occupancy of around 20% in North American limited-service hotels in the two weeks leading up to the earning release, "benefitting from leisure and drive-to demand." Nonetheless, as Marriott said at the top of its earnings release, 1Q20 results "were dramatically impacted by the COVID-19 global pandemic and efforts to contain it." For 1Q20 compared to 1Q19, RevPAR and occupancy fell across all Marriott brands, including The Ritz-Carlton.

75.    Plaintiff and the other Class Members acquired an all-risk insurance policy from Zurich to protect their businesses against the losses addressed by the Property Damage and Time Element coverages of the Policy. As a result of the presence of COVID-19 and the Closure Orders, Plaintiff and the other Class Members suffered multiple occurrences of direct physical loss of or

damage to Covered Property at thousands of locations throughout the world, and also suffered Business Interruption losses, including payroll, and incurred Extra Expense at their Covered Properties. Plaintiff and the other Class Members also suffered losses and incurred costs or expenses at thousands of locations throughout the world from Interruption by Civil and Military Authority, impaired Ingress/Egress, Cancellation of Bookings, Walked Guests, Guest Rebates, and Protection and Preservation of Property. Plaintiff and the other Class Members also reasonably and necessarily incurred expenses to reduce their Time Element losses.

76. Crescent, which owns the Ritz-Carlton, Dallas, submitted a claim for loss to Zurich under the Policy due to the presence of COVID-19 and the Closure Orders. On May 13, 2020, Zurich's National General Adjuster sent Marriott an 11-page letter, from Zurich headquarters in Illinois, in which Zurich stated that it is investigating claims "under a reservation of rights." The National General Adjuster outlined purported bases for denial of Property Damage and Time Element coverage, and made the boilerplate statement that Zurich "will provide you with our coverage position as soon as our investigation is complete." This letter from the National General Adjuster is an effective repudiation of the Policy by Zurich.

77. On May 14, 2020, one day after the National General Adjuster letter, Zurich Group CFO George Quinn announced to reporters, in response to questions about claims by Zurich policyholders due to COVID-19, that whether a virus constitutes property damage "will be litigated again." The May 14, 2020 announcement by Mr. Quinn is a repudiation of the Policy by Zurich.

78. Two weeks after Mr. Quinn's public repudiation, even before a denial letter, Zurich denied the claim of a popular California-based chain of hamburger and cheeseburger restaurants. That denial confirms that Zurich's policy and practice is to deny Property Damage and Time Element claims arising from COVID-19, resulting in litigation, as Zurich Group CFO George Quinn publicly announced.

79. Zurich's repudiation of coverage is wrongful. Any alleged requirement of direct physical loss for the Property Damage or Time Element coverages in the Policy is satisfied by the

impairment of the business function of Plaintiffs' and other Class Members' Covered Properties at locations throughout the world. Neither can Zurich meet its burden to show that any exclusions apply, including exclusions for microorganisms, contamination, or (purportedly for the 2020 to 2021 Policy) communicable disease.

80.     Zurich did not define "microorganism" in the Policy and did not identify "virus" as a microorganism in the Policy. Viruses are not generally considered to be organisms by scientists, and Zurich cannot retroactively define "microorganism" to include viruses now that a virus has resulted in losses covered by the Policy. The addition of a separate (though still defective) exclusion for viruses in the 2020-2021 policy is an acknowledgement by Zurich that such an exclusion did not exist in the 2019-2020 policy.

81.     Section B of the policy contains a "contamination" exclusion, which applies to pollution, hazardous materials, and similar conditions, but the policy does not extend the undefined term "contamination" to viruses. Furthermore, the exclusion only applies to costs incurred as a direct result of contamination, not costs incurred as a result of other causes or costs incurred to prevent contamination, and it does not apply at all if the contamination results from "other direct physical damage not excluded by this policy." Policy § 2.B.5.D. In addition, Section C of the Policy, which contains both Time Element coverages and Time Element Coverage Extensions, does not contain any contamination exclusion.

## V.     CLASS ACTION ALLEGATIONS

82.     Plaintiff brings this action pursuant to Rules 23(a), 23(b)(1), 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, individually and on behalf of all others similarly situated.

83.     Plaintiff seeks to represent a worldwide Class defined as all persons and entities with claims for Property Damage coverage, Time Element Coverages, or Time Element Coverage Extensions under the Policy, including persons and entities that:

> (a)     incurred reasonable and necessary costs to temporarily protect
>            or preserve Covered Property due to actual or immediately

imminent insured direct physical loss or damage due to COVID-19; or

(b) suffered a suspension of business related to COVID-19, at premises covered by the Policy; or

(c) incurred Extra Expense that they would not have incurred if there had been no direct physical loss or damage to the Covered Property, or to temporarily continue as nearly normal as practicable the conduct of their business; or

(d) sustained losses caused by action of a civil or military authority due to COVID-19; or

(e) sustained losses caused by impaired ingress or egress due to COVID-19 or the Closure Orders; or

(f) sustained cancelled booking losses due to COVID-19 or the Closure Orders; or

(g) incurred costs to walk or rebate guests due to COVID-19 or the Closure Orders; or

(h) (i) suffered losses to take reasonable action to temporarily protect and preserve property "necessary to prevent imminent direct physical loss or damage" to property, or (ii) reasonably and necessarily incurred expenses to reduce their Time Element losses.

84.     Excluded from the Class are Defendant and any of its members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; governmental entities; and the Court staff assigned to this case and their immediate family members.  Plaintiff reserves the right to modify or amend the Class definition, as appropriate, during the course of this litigation.

85.     This action has been brought and may properly be maintained on behalf of the Class proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

86.     **Numerosity—Federal Rule of Civil Procedure 23(a)(1).**  The members of the defined Class are so numerous that individual joinder of all Class Members is impracticable.  While Plaintiff is informed and believes that there are thousands of members of the Class, the precise number of Class Members is unknown to Plaintiff but may be ascertained from Defendant's books and records.  Class Members may be notified of the pendency of this action by recognized, Court-

approved notice dissemination methods, which may include U.S. Mail, electronic mail, internet postings, and/or published notice.

87. **Commonality and Predominance—Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** This action involves common questions of law and fact, which predominate over any questions affecting only individual Class Members, including, without limitation:

(a) Zurich issued the all-risk Policy in exchange for payment of premiums by Marriott for the Class;

(b) whether the Class suffered a covered loss based on the Policy;

(c) whether Zurich wrongfully repudiated all claims based on COVID-19 and the Closure Orders;

(d) whether Zurich's Property Damage – Protection and Preservation of Property coverage applies to business losses caused by COVID-19;

(e) whether Zurich's Business Interruption coverage applies to a suspension of business caused by COVID-19 and the Closure Orders;

(f) whether Zurich's Extra Expense coverage applies to business losses caused by COVID-19 and the Closure Orders;

(g) whether Zurich's Interruption by Civil and Military Authority coverage applies to a suspension of business due to the Closure Orders;

(h) whether Zurich's Ingress/Egress coverage applies to business losses from impaired access due to COVID-19;

(i) whether Zurich's Cancellation of Bookings coverage applies to business losses caused by COVID-19 and the Closure Orders;

(j) whether Zurich's Walked Guests and Guest Rebates coverages apply to business losses caused by COVD-19 and the Closure Orders;

(k) whether Zurich's Time Element Coverage Extensions – Protection and Preservation coverage applies to business losses caused by COVID-19 and the Closure Orders,

(l)     whether the Class can recover from Zurich the expenses necessarily and reasonably incurred by them to reduce their Time Element losses;

(m)    whether Zurich has breached its contract of insurance through a blanket repudiation of all claims based on business interruption, business losses, costs or closures related to COVID-19 and the Closure Orders; and

(n)    whether Plaintiff and the other Class Members are entitled to an award of reasonable attorney fees, interest and costs.

88.    **Typicality—Federal Rule of Civil Procedure 23(a)(3).**  Plaintiff's claims are typical of the other Class Members' claims because Plaintiff and the other Class Members are all similarly affected by Defendant's refusal to pay under its Business Interruption, Extra Expense**,** Interruption by Civil and Military Authority, Ingress/Egress, Cancellation of Bookings, Walked Guests, Guest Rebates and Protection and Preservation of Property coverages.  Plaintiff's claims are based upon the same legal theories as those of the other Class Members.  Plaintiff and the other Class Members sustained damages as a direct and proximate result of the same wrongful practices in which Defendant engaged.

89.    **Adequacy of Representation—Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate Class representative because Plaintiff's interests do not conflict with the interests of the other Class Members whom they seek to represent, Plaintiff has retained counsel competent and experienced in complex class action litigation, including successfully litigating class action cases similar to this one, where insurers breached contracts with insureds by failing to pay the amounts owed under their policies, and Plaintiff intends to prosecute this action vigorously. The interests of the above-defined Classes will be fairly and adequately protected by Plaintiff and their counsel.

90.    **Inconsistent or Varying Adjudications and the Risk of Impediments to Other Class Members' Interests—Federal Rule of Civil Procedure 23(b)(1).**  Plaintiff seeks class-wide adjudication as to the interpretation, and resultant scope, of Defendant's Business Interruption, Extra Expense, Interruption by Civil and Military Authority, Ingress/Egress,

Cancellation of Bookings, Walked Guests, Guest Rebates, and Protection and Preservation of Property coverages. The prosecution of separate actions by individual Class Members would create an immediate risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for the Defendant. Moreover, the adjudications sought by Plaintiff could, as a practical matter, substantially impair or impede the ability of other Class Members, who are not parties to this action, to protect their interests.

91.     **Declaratory and Injunctive Relief—Federal Rule of Civil Procedure 23(b)(2).** Defendant acted or refused to act on grounds generally applicable to Plaintiff and the other Class Members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class Members.

92.     **Superiority—Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VI.     CLAIMS FOR RELIEF

### COUNT I
### BREACH OF CONTRACT – PROPERTY DAMAGE, PROTECTION AND PRESERVATION OF PROPERTY COVERAGE

93.     Plaintiff repeats and realleges Paragraphs 1-92 as if fully set forth herein.

94.     Plaintiff brings this Count individually and on behalf of the Class.

95.     The Policy is a contract under which Marriott paid Zurich premiums on behalf of the Class, in exchange for Zurich's promise to pay their losses for claims covered by the Policy.

96.     In the Policy, Zurich agreed to pay for costs to "temporarily protect or preserve insured property," including costs for actions due to actual "insured direct physical loss or damage"

to insured property, or for actions necessary to "prevent immediately imminent" "insured direct physical loss or damage" to insured property.

97.     COVID-19 caused actual "insured direct physical loss or damage" and threatened "immediately imminent" "insured direct physical loss or damage."

98.     Plaintiff and the other Class Members incurred reasonable and necessary costs to "temporarily protect or preserve" Covered Property as a result of actual "insured direct physical loss or damage" to Covered Property caused by COVID-19.

99.     Plaintiff and the Class also incurred reasonable and necessary costs to "temporarily protect or preserve" Covered Property to "prevent immediately imminent" "insured direct physical loss or damage" to Covered Property caused by COVID-19.

100.     Class Members have complied with all applicable provisions of the Policy and/or those provisions have been waived by Zurich or Zurich is estopped from asserting them, and yet Zurich has abrogated its insurance coverage obligations pursuant to the Policy's clear and unambiguous terms.

101.     By repudiating coverage for cost incurred by the Class to temporarily protect or preserve Covered Property in connection with the COVID-19 pandemic, Zurich has breached its Property Damage, Protection and Preservation of Property coverage obligations under the Policy.

102.     As a result of Zurich's breach of the Policy, the Class has sustained substantial damages for which Zurich is liable, in an amount to be established at trial.

### COUNT II
### BREACH OF CONTRACT -- BUSINESS INTERRUPTION COVERAGE

103.     Plaintiff repeats and realleges Paragraphs 1-92 as if fully set forth herein.

104.     Plaintiff brings this Count individually and on behalf of the Class.

105.     The Policy is a contract under which Marriott paid Zurich premiums on behalf of the Class, in exchange for Zurich's promise to pay their losses for claims covered by the Policy.

106.     In the Policy, Zurich agreed to pay for its Insureds actual Business Interruption losses due to the "suspension of business operations or services" during the "Period of Liability."

107.    Business Interruption coverage applies when the Insured is "wholly or partially prevented from producing goods or continuing business operations or services" at the Covered Property.  The "Period of Liability" begins "with the interruption or interference with the business" and ends "not later than 365 days thereafter."

108.    A recoverable Business Interruption loss is "Net Profit, before deducting income taxes, which is not earned as a direct result of the interruption of production or suspension of business operations or services," plus ongoing Fixed Charges and Ordinary Payroll incurred.

109.    COVID-19 caused direct physical loss and damage to the Covered Property of Class Members, requiring suspension of operations at their Covered Property.  Losses caused by COVID-19 thus triggered the Business Interruption provision of the Policy.

110.    Class Members have complied with all applicable provisions of the Policy and/or those provisions have been waived by Zurich or Zurich is estopped from asserting them, and yet Zurich has abrogated its insurance coverage obligations pursuant to the Policy's clear and unambiguous terms.

111.    By repudiating coverage for any Business Interruption losses incurred by the Class in connection with the COVID-19 pandemic, Zurich has breached its coverage obligations under the Policy.

112.    As a result of Zurich's breach of the Policy, the Class has sustained substantial damages for which Zurich is liable, in an amount to be established at trial.

**COUNT III**
**BREACH OF CONTRACT – EXTRA EXPENSE COVERAGE**

113.    Plaintiff repeats and realleges Paragraphs 1-92 as if fully set forth herein.

114.    Plaintiff brings this Count individually and on behalf of the Class.

115.    The Policy is a contract under which Marriott paid Zurich premiums on behalf of the Class, in exchange for Zurich's promise to pay their losses for claims covered by the Policy.

116.    In the Policy, Zurich agreed to pay reasonable and necessary Extra Expense that its Insureds incur during the "Period of Liability" that they would not have incurred if there had been no direct physical loss or damage to the Covered Property.

117.    "Extra Expense" includes "expenses to temporarily continue as nearly normal as practicable the conduct of the Insured's business."

118.    Due to COVID-19 and the Closure Orders, Class Members incurred Extra Expense at Covered Property.

119.    Class Members have complied with all applicable provisions of the Policy and/or those provisions have been waived by Zurich or Zurich is estopped from asserting them, and yet Zurich has abrogated its insurance coverage obligations pursuant to the Policy's clear and unambiguous terms.

120.    By repudiating coverage for any business losses incurred by the Class in connection with the Closure Orders and the COVID-19 pandemic, Zurich has breached its coverage obligations under the Policy.

121.    As a result of Zurich's breach of the Policy, the Class has sustained substantial damages for which Zurich is liable, in an amount to be established at trial.

**COUNT IV**
**BREACH OF CONTRACT – CIVIL AUTHORITY COVERAGE**

122.    Plaintiff repeats and realleges Paragraphs 1-92 as if fully set forth herein.

123.    Plaintiff brings this Count individually and on behalf of the Class.

124.    The Policy is a contract under which Marriott paid Zurich premiums on behalf of the Class, in exchange for Zurich's promise to pay their losses for claims covered by the Policy.

125.    In the Policy, Zurich agreed to pay for losses by its Insureds for losses sustained when access to Covered Property "is impaired by order or action of civil or military authority," for up to a 90 day period and 15 Statute Miles.

126.    The Closure Orders triggered the Civil Authority provision of the Policy.

127.     Class Members have complied with all applicable provisions of the Policy, and/or those provisions have been waived by Zurich, or Zurich is estopped from asserting them, and yet Zurich has abrogated its insurance coverage obligations pursuant to the Policy's clear and unambiguous terms.

128.     By repudiating coverage for any business losses incurred by the Class in connection with the Closure Orders and the COVID-19 pandemic, Zurich has breached its coverage obligations under the Policy.

129.     As a result of Zurich's breach of the Policy, the Class has sustained substantial damages for which Zurich is liable, in an amount to be established at trial.

**COUNT V**
**BREACH OF CONTRACT – INGRESS/EGRESS COVERAGE**

130.     Plaintiff repeats and realleges Paragraphs 1-92 as if fully set forth herein.

131.     Plaintiff brings this Count individually and on behalf of the Class.

132.     The Policy is a contract under which Marriott paid Zurich premiums on behalf of the Class, in exchange for Zurich's promise to pay their losses for claims covered by the Policy.

133.     In the Policy, Zurich agreed to pay for Ingress/Egress losses and costs of its Insureds "due to impairment of ingress to or egress from an Insured Location," for up to a 90 day period and 15 Statute Miles.

134.     The Ingress/Egress coverage applies whether or not the Covered Property is damaged, "provided that such impairment is a direct result of direct physical damage of the type" insured by the Policy.

135.     The Closure Orders triggered the Ingress/Egress provision of the Policy.

136.     Class Members have complied with all applicable provisions of the Policy, and/or those provisions have been waived by Zurich, or Zurich is estopped from asserting them, and yet Zurich has abrogated its insurance coverage obligations pursuant to the Policy's clear and unambiguous terms.

27

137.    By repudiating coverage for any business losses incurred by the Class in connection with the Closure Orders and the COVID-19 pandemic, Zurich has breached its coverage obligations under the Policy.

138.    As a result of Zurich's breach of the Policy, the Class has sustained substantial damages for which Zurich is liable, in an amount to be established at trial.

**COUNT VI**
**BREACH OF CONTRACT – CANCELLATION OF BOOKINGS COVERAGE**

139.    Plaintiff repeats and realleges Paragraphs 1-92 as if fully set forth herein.

140.    Plaintiff brings this Count individually and on behalf of the Class.

141.    The Policy is a contract under which Marriott paid Zurich premiums on behalf of the Class, in exchange for Zurich's promise to pay their losses for claims covered by the Policy.

142.    In the Policy, Zurich agreed to pay for losses by its Insureds due to "the cancellation of, and/or inability to accept bookings or reservations" as the direct result of, among other reasons, "within a radius of 5 miles of an Insured Location," an "outbreak of contagious and/or infectious disease as well as restrictive guidance or travel advisories placed on a region or area" by the CDC, WHO, or other "comparable authority."

143.    The Closure Orders triggered the Cancellation of Bookings provision of the Policy.

144.    Class Members have complied with all applicable provisions of the Policy, and/or those provisions have been waived by Zurich, or Zurich is estopped from asserting them, and yet Zurich has abrogated its insurance coverage obligations pursuant to the Policy's clear and unambiguous terms.

145.    By repudiating coverage for any business losses incurred by the Class in connection with the Closure Orders and the COVID-19 pandemic, Zurich has breached its coverage obligations under the Policy.

146.    As a result of Zurich's breach of the Policy, the Class has sustained substantial damages for which Zurich is liable, in an amount to be established at trial.

## COUNT VII
## BREACH OF CONTRACT – WALKED GUESTS OR GUEST REBATES COVERAGE

147.    Plaintiff repeats and realleges Paragraphs 1-92 as if fully set forth herein.

148.    Plaintiff brings this Count individually and on behalf of the Class.

149.    The Policy is a contract under which Marriott paid Zurich premiums on behalf of the Class, in exchange for Zurich's promise to pay their losses for claims covered by the Policy.

150.    In the Policy, Zurich agreed to pay for losses by its Insureds due to "the cancellation of, and/or inability to accept bookings or reservations" as the direct result of, among other reasons, "within a radius of 5 miles of an Insured Location," an "outbreak of contagious and/or infectious disease as well as restrictive guidance or travel advisories placed on a region or area" by the CDC, WHO, or other "comparable authority."

151.    The Closure Orders triggered the Cancellation of Bookings provision of the Policy.

152.    Class Members have complied with all applicable provisions of the Policy, and/or those provisions have been waived by Zurich, or Zurich is estopped from asserting them, and yet Zurich has abrogated its insurance coverage obligations pursuant to the Policy's clear and unambiguous terms.

153.    By repudiating coverage for any business losses incurred by the Class in connection with the Closure Orders and the COVID-19 pandemic, Zurich has breached its coverage obligations under the Policy.

154.    As a result of Zurich's breach of the Policy, the Class has sustained substantial damages for which Zurich is liable, in an amount to be established at trial.

## COUNT VIII
## BREACH OF CONTRACT – TIME ELEMENT COVERAGE EXTENSIONS, PROTECTION AND PRESERVATION COVERAGE

155.    Plaintiff repeats and realleges Paragraphs 1-92 as if fully set forth herein.

156.    Plaintiff brings this Count individually and on behalf of the Class.

157.    The Policy is a contract under which Marriott paid Zurich premiums on behalf of the Class, in exchange for Zurich's promise to pay their losses for claims covered by the Policy.

158.    In the Policy, Zurich agreed to pay its Insureds Time Element Coverage Extensions, "Protection and Preservation of Property" losses incurred "in taking reasonable action for the temporary protection and preservation of property" "necessary to prevent imminent direct physical loss or damage" to property.

159.    Class Members suspended operations and took other actions that triggered the Time Element Coverage Extensions, Protection and Preservation provision of the Policy.

160.    Class Members also reasonably and necessarily incurred expenses to reduce their Time Element losses.

161.    Class Members have complied with all applicable provisions of the Policy, and/or those provisions have been waived by Zurich, or Zurich is estopped from asserting them, and yet Zurich has abrogated its insurance coverage obligations pursuant to the Policy's clear and unambiguous terms.

162.    By repudiating coverage for any business losses incurred by the Class in connection with the Closure Orders and the COVID-19 pandemic, Zurich has breached its coverage obligations under the Policy.

163.    As a result of Zurich's breach of the Policy, the Class has sustained substantial damages for which Zurich is liable, in an amount to be established at trial.

**COUNT IX**
**DECLARATORY JUDGMENT – PROPERTY DAMAGE, PROTECTION AND**
**PRESERVATION OF PROPERTY COVERAGE**

164.    Plaintiff repeats and realleges Paragraphs 1-92 as if fully set forth herein.

165.    Plaintiff brings this Count individually and on behalf of the Class.

166.    The Policy is a contract under which Marriott paid Zurich premiums on behalf of the Class, in exchange for Zurich's promise to pay their losses for claims covered by the Policy.

167.    Class Members have complied with all applicable provisions of the Policy and/or those provisions have been waived by Zurich, or Zurich is estopped from asserting them, and yet Zurich has abrogated its insurance coverage obligations pursuant to the Policy's clear and

unambiguous terms and has wrongfully and illegally refused to provide coverage to which Class Members are entitled.

168. Zurich has repudiated coverage related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Class have filed a claim.

169. An actual case or controversy exists regarding Class Members' rights and Zurich's obligations under the Policy to reimburse the full amount of reasonable and necessary costs incurred by the Class to "temporarily protect or preserve" Covered Property: (a) as a result of actual "insured direct physical loss or damage" to Covered Property caused by COVID-19, and (b) to "prevent immediately imminent" "insured direct physical loss or damage" to Covered Property caused by COVID-19.

170. Pursuant to 28 U.S.C. § 2201, Plaintiff seeks a declaratory judgment from this Court declaring the following:

    i. Class Members' Property Damage, Protection and Preservation of Property losses incurred in connection with the COVID-19 pandemic are insured losses under the Policy; and

    ii. Zurich is obligated to pay the Class for the full amount of the Property Damage, Protection and Preservation of Property losses incurred by their businesses stemming from the COVID-19 pandemic.

**COUNT X**
**DECLARATORY JUDGMENT – BUSINESS INTERRUPTION COVERAGE**

171. Plaintiff repeats and realleges Paragraphs 1-92 as if fully set forth herein.

172. Plaintiff brings this Count individually and on behalf of the Class.

173. The Policy is a contract under which Marriott paid Zurich premiums on behalf of the Class, in exchange for Zurich's promise to pay their losses for claims covered by the Policy.

174. Class Members have complied with all applicable provisions of the Policy and/or those provisions have been waived by Zurich, or Zurich is estopped from asserting them, and yet

Zurich has abrogated its insurance coverage obligations pursuant to the Policy's clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Class Members are entitled.

175. Zurich has repudiated coverage related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Class have filed a claim.

176. An actual case or controversy exists regarding Class Members' rights and Zurich's obligations under the Policy to reimburse the full amount of Business Interruption losses incurred by the Class in connection with suspension of their businesses stemming from the COVID-19 pandemic.

177. Pursuant to 28 U.S.C. § 2201, Plaintiff seeks a declaratory judgment from this Court declaring the following:

  i. Class Members' Business Interruption losses incurred in connection with the Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic are insured losses under the Policy; and

  ii. Zurich is obligated to pay the Class for the full amount of the Business Interruption losses incurred and to be incurred in connection with the Closure Orders during the Period of Liability and the necessary interruption of their businesses stemming from the COVID-19 pandemic.

**COUNT XI**
**DECLARATORY JUDGMENT – EXTRA EXPENSE COVERAGE**

178. Plaintiff repeats and realleges Paragraphs 1-92 as if fully set forth herein.

179. Plaintiff brings this Count individually and on behalf of the Class.

180. The Policy is a contract under which Marriott paid Zurich premiums on behalf of the Class, in exchange for Zurich's promise to pay their losses for claims covered by the Policy.

181. Class Members have complied with all applicable provisions of the Policy and/or those provisions have been waived by Zurich, or Zurich is estopped from asserting them, and yet

Zurich has abrogated its insurance coverage obligations pursuant to the Policy's clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Class Members are entitled.

182. Zurich has repudiated coverage related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Class have filed a claim.

183. An actual case or controversy exists regarding Class Members' rights and Zurich's obligations under the Policy to reimburse the full amount of Extra Expense losses incurred by the Class in connection with suspension of their businesses stemming from the COVID-19 pandemic.

184. Pursuant to 28 U.S.C. § 2201, Plaintiff seeks a declaratory judgment from this Court declaring the following:

    i. Class Members' Extra Expense losses incurred in connection with the Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic are insured losses under the Policy; and

    ii. Zurich is obligated to pay the Class for the full amount of the Extra Expense losses incurred and to be incurred in connection with the Closure Orders during the Period of Liability and the necessary interruption of their businesses stemming from the COVID-19 pandemic.

## COUNT XII
## DECLARATORY JUDGMENT – CIVIL AUTHORITY COVERAGE

185. Plaintiff repeats and realleges Paragraphs 1-92 as if fully set forth herein.

186. Plaintiff brings this Count individually and on behalf of the Class.

187. The Policy is a contract under which Marriott paid Zurich premiums on behalf of the Class, in exchange for Zurich's promise to pay their losses for claims covered by the Policy.

188. Class Members have complied with all applicable provisions of the Policy and/or those provisions have been waived by Zurich, or Zurich is estopped from asserting them, and yet Zurich has abrogated its insurance coverage obligations pursuant to the Policy's clear and

unambiguous terms and has wrongfully and illegally refused to provide coverage to which Class Members are entitled.

189.     Zurich has repudiated coverage related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Class have filed a claim.

190.     An actual case or controversy exists regarding Class Members' rights and Zurich's obligations under the Policy to reimburse the full amount of Interruption by Civil and Military Authority losses incurred by the Class in connection with suspension of their businesses stemming from the COVID-19 pandemic.

191.     Pursuant to 28 U.S.C. § 2201, Plaintiff seeks a declaratory judgment from this Court declaring the following:

   i.     Class Members' Interruption by Civil and Military Authority losses incurred in connection with the Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic are insured losses under the Policy; and

   ii.    Zurich is obligated to pay the Class for the full amount of the Interruption by Civil and Military Authority losses incurred and to be incurred in connection with the Closure Orders during the Period of Liability and the necessary interruption of their businesses stemming from the COVID-19 pandemic.

**COUNT XIII**
**DECLARATORY JUDGMENT – INGRESS/EGRESS COVERAGE**

192.     Plaintiff repeats and realleges Paragraphs 1-92 as if fully set forth herein.

193.     Plaintiff brings this Count individually and on behalf of the Class.

194.     The Policy is a contract under which Marriott paid Zurich premiums on behalf of the Class, in exchange for Zurich's promise to pay their losses for claims covered by the Policy.

195.     Class Members have complied with all applicable provisions of the Policy and/or those provisions have been waived by Zurich, or Zurich is estopped from asserting them, and yet

Zurich has abrogated its insurance coverage obligations pursuant to the Policy's clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Class Members are entitled.

196. Zurich has repudiated coverage related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Class have filed a claim.

197. An actual case or controversy exists regarding Class Members' rights and Zurich's obligations under the Policy to reimburse the full amount of Ingress/Egress losses incurred by the Class in connection with suspension of their businesses stemming from the COVID-19 pandemic.

198. Pursuant to 28 U.S.C. § 2201, Plaintiff seeks a declaratory judgment from this Court declaring the following:

    i.    Class Members' Ingress/Egress losses incurred in connection with the Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic are insured losses under the Policy; and

    ii.    Zurich is obligated to pay the Class for the full amount of the Ingress/Egress losses incurred and to be incurred in connection with the Closure Orders during the Period of Liability and the necessary interruption of their businesses stemming from the COVID-19 pandemic.

**COUNT XIV**
**DECLARATORY JUDGMENT – CANCELLATION OF BOOKINGS COVERAGE**

199. Plaintiff Crescent repeats and realleges Paragraphs 1-92 as if fully set forth herein.

200. Plaintiff brings this Count individually and on behalf of the Class.

201. The Policy is a contract under which Marriott paid Zurich premiums on behalf of the Class, in exchange for Zurich's promise to pay their losses for claims covered by the Policy.

202. Class Members have complied with all applicable provisions of the Policy and/or those provisions have been waived by Zurich, or Zurich is estopped from asserting them, and yet Zurich has abrogated its insurance coverage obligations pursuant to the Policy's clear and

unambiguous terms and has wrongfully and illegally refused to provide coverage to which Class Members are entitled.

203.    Zurich has repudiated coverage related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Class have filed a claim.

204.    An actual case or controversy exists regarding Class Members' rights and Zurich's obligations under the Policy to reimburse the full amount of Cancellation of Bookings losses incurred by the Class in connection with suspension of their businesses stemming from the COVID-19 pandemic.

205.    Pursuant to 28 U.S.C. § 2201, Plaintiff seeks a declaratory judgment from this Court declaring the following:

   i.    Class Members' Cancellation of Bookings losses incurred in connection with the Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic are insured losses under the Policy; and

   ii.    Zurich is obligated to pay the Class for the full amount of the Cancellation of Bookings losses incurred and to be incurred in connection with the Closure Orders during the Period of Liability and the necessary interruption of their businesses stemming from the COVID-19 pandemic.

**COUNT XV**
**DECLARATORY JUDGMENT – WALKED GUESTS OR GUEST REBATES COVERAGE**

206.    Plaintiff repeats and realleges Paragraphs 1-92 as if fully set forth herein.

207.    Plaintiff brings this Count individually and on behalf of the Class.

208.    The Policy is a contract under which Marriott paid Zurich premiums on behalf of the Class, in exchange for Zurich's promise to pay their losses for claims covered by the Policy.

209.    Class Members have complied with all applicable provisions of the Policy and/or those provisions have been waived by Zurich, or Zurich is estopped from asserting them, and yet

Zurich has abrogated its insurance coverage obligations pursuant to the Policy's clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Class Members are entitled.

210.    Zurich has repudiated coverage related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Class have filed a claim.

211.    An actual case or controversy exists regarding Class Members' rights and Zurich's obligations under the Policy to reimburse the full amount of Walked Guests or Guest Rebates losses incurred by the Class in connection with suspension of their businesses stemming from the COVID-19 pandemic.

212.    Pursuant to 28 U.S.C. § 2201, Plaintiff seeks a declaratory judgment from this Court declaring the following:

i.    Class Members' Walked Guests or Guest Rebates losses incurred in connection with the Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic are insured losses under the Policy; and

ii.    Zurich is obligated to pay the Class for the full amount of the Walked Guests or Guest Rebates losses incurred and to be incurred in connection with the Closure Orders during the Period of Liability and the necessary interruption of their businesses stemming from the COVID-19 pandemic.

## COUNT XVI
## DECLARATORY JUDGMENT – TIME ELEMENT COVERAGE EXTENSIONS, PROTECTION AND PRESERVATION COVERAGE

213.    Plaintiff repeats and realleges Paragraphs 1-92 as if fully set forth herein.

214.    Plaintiff brings this Count individually and on behalf of the Class.

215.    The Policy is a contract under which Marriott paid Zurich premiums on behalf of the Class, in exchange for Zurich's promise to pay their losses for claims covered by the Policy.

216.     Class Members have complied with all applicable provisions of the Policy and/or those provisions have been waived by Zurich, or Zurich is estopped from asserting them, and yet Zurich has abrogated its insurance coverage obligations pursuant to the Policy's clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Class Members are entitled.

217.     Zurich has repudiated coverage related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Class have filed a claim.

218.     An actual case or controversy exists regarding Members' rights and Zurich's obligations under the Policy to reimburse the full amount of Time Element Coverage Extensions, Protection and Preservation of Property losses incurred by the Class in connection with suspension of their businesses stemming from the COVID-19 pandemic.

219.     Pursuant to 28 U.S.C. § 2201, Plaintiff seeks a declaratory judgment from this Court declaring the following:

    i.    Class Members' Time Element Coverage Extensions, Protection and Preservation of Property losses incurred in connection with the Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic are insured losses under the Policy; and

    ii.    Expenses reasonably and necessarily incurred expenses by Class Members to reduce their Time Element losses are insured losses under the Policy; and

    iii.    Zurich is obligated to pay the Class for the full amount of the Time Element Coverage Extensions, Protection and Preservation of Property losses incurred and to be incurred in connection with the Closure Orders during the Period of Liability and the necessary interruption of their businesses stemming from the COVID-19 pandemic, and Zurich is also obligated to pay the Class for the full amount of expenses they reasonably and necessarily incurred to reduce their Time Element losses.

## VII.  REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all Class Members, respectfully requests that the Court enter judgment in their favor and against Defendant as follows:

a.      Entering an order certifying the proposed worldwide Class, as requested herein, designating Plaintiff as Class representative, and appointing Plaintiff's undersigned attorneys as Counsel for the Class;

b.      Entering judgment on Counts I-VIII in favor of the Class and awarding damages for breach of contract in an amount to be determined at trial;

c.      Entering declaratory judgments on Counts IX-XVI in favor of the Class, as follows;

    i.      Class Members' Property Damage, Protection and Preservation of Property losses stemming from the COVID-19 pandemic are insured losses under the Policy;

    ii.     Class Members' "Time Element Coverages" Business Interruption and Extra Expense losses, and their "Time Element Coverage Extensions" Interruption by Civil and Military Authority, Ingress/Egress, Cancellation of Bookings, Walked Guests, Guest Rebates, and Protection and Preservation of Property losses incurred in connection with the Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic are insured losses under the Policy, as are the expenses reasonably and necessarily incurred by the Class to reduce their Time Element losses; and

    iii.    Zurich is obligated to pay for the foregoing losses incurred and to be incurred by the Class related to COVID-19, the Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic, and to pay the Class the expenses reasonably incurred by them to reduce their Time Element losses;

d.      Ordering Defendant to pay both pre- and post-judgment interest on any amounts awarded;

e.    Ordering Defendant to pay attorneys' fees and costs of suit; and

f.    Ordering such other and further relief as may be just and proper.

## VIII.   JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims so triable.

Dated: June 12, 2020                               Respectfully submitted,

/s/ *Adam J. Levitt*
Adam J. Levitt
Amy E. Keller
Daniel R. Ferri
Mark Hamill
Laura E. Reasons
**DICELLO LEVITT GUTZLER LLC**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois  60602
Telephone:  312-214-7900
alevitt@dicellolevitt.com
akeller@dicellolevitt.com
dferri@dicellolevitt.com
mhamill@dicellolevitt.com
lreasons@dicellolevitt.com

Douglas Daniels*
**DANIELS & TREDENNICK**
6363 Woodway, Suite 700
Houston, Texas  77057
Telephone:  713-917-0024
douglas.daniels@dtlawyers.com

Timothy W. Burns*
Jeff J. Bowen*
Jesse J. Bair*
Freya K. Bowen*
**BURNS BOWEN BAIR LLP**
One South Pinckney Street, Suite 930
Madison, Wisconsin 53703
Telephone: 608-286-2302
tburns@bbblawllp.com
jbowen@bbblawllp.com
jbair@bbblawllp.com
fbowen@bbblawllp.com

Mark Lanier*
Alex Brown*
Skip McBride*
**THE LANIER LAW FIRM PC**
10940 West Sam Houston Parkway North
Suite 100
Houston, Texas  77064
Telephone:  713-659-5200
WML@lanierlawfirm.com
alex.brown@lanierlawfirm.com
skip.mcbride@lanierlawfirm.com

***Counsel for Plaintiff
and the Proposed Classes***

*Applications for admission *pro hac vice* to be filed