Exhibit 23

1  THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2              FOR THE COUNTY OF MONTEREY

3                                        CERTIFIED COPY

4  _____
   The Inns by the Sea              )
                                    )
5  vs.                              ) CASE NO. 20CV001274
                                    )
6  California Mutual Insurance      )
   Company                          )
7  _____)

8          REPORTER'S TRANSCRIPT OF PROCEEDINGS

9              MONDAY, AUGUST 4, 2020

10     BEFORE THE HONORABLE LYDIA M. VILLARREAL, JUDGE

11

12

13  APPEARANCES:

14  FOR PLAINTIFF:           SAM FERGUSON
    (APPEARING ON COURT CALL)  ATTORNEY AT LAW
15
                             MICHAEL J. REISER
16                           ATTORNEY AT LAW

17

18  FOR DEFENDANT:           RYAN Z. KELLER
    (APPEARING ON COURT CALL)  ATTORNEY AT LAW
19
                             STEVEN HAYES
20                           ATTORNEY AT LAW

21

22

23

24  REPORTED BY:  JAMIE L. SETTERQUIST CSR 13362
                  OFFICIAL COURT REPORTER
25                MONTEREY COUNTY SUPERIOR COURT

                                                        1

```
 1        MONTEREY, CA; Monday, August 6, 2020; 9:24 A.M.

 2

 3                      P R O C E E D I N G S

 4        THE COURT:  Inns by the Sea versus California

 5   Mutual Insurance Company.

 6        MR. KELLER:  Good morning Your Honor.  Ryan

 7   Keller on the phone for Defendant, California Mutual

 8   Insurance Company.  I also have Steven Hayes from my

 9   office on the phone.

10        THE COURT:  I appreciate you doing it, but

11   it's easier for me if I do it.  Sam Ferguson for Inns by

12   the Sea?

13        MR. FERGUSON:  Good morning.  Sam Ferguson for

14   Inns by the Sea.

15        THE COURT:  Thank you very much.  Steven Hayes

16   for California Mutual?

17        MR. HAYES:  Good morning, your Honor.

18        THE COURT:  And who is going to be speaking on

19   behalf of California Mutual?  Will it be Mr. Hayes or

20   Mr. Keller?

21        MR. KELLER:  Mr. Keller, your Honor.

22        THE COURT:  Thank you very much.  Mr. Keller

23   on behalf of The Inns by the Sea.

24        MR. REISER:  Good morning, your Honor.

25   Michael Reiser.
```

THE COURT:  And who will be speaking on behalf
of plaintiffs?

                    MR. FERGUSON:  Sam Ferguson of the Meade Law
Firm will be speaking on behalf of Inns by the Sea as
plaintiffs.

                    THE COURT:  All right.  Thank you so much.  So
I have gone over what you filed, and let me just start
by saying the economic damage caused by COVID is just
heartbreaking, and this case is yet one more of the
heartbreak.

                    There are two things that are of concern to
me.  It seems to me that the language of the policy
supported the defendant's position that it talks about
the business suspension must be caused by direct
physical loss of or damage to property at the premises,
and it seems that the cases for the most part are --
seek to address some sort of physical destruction or
physical change in usefulness, and I am not sure that
COVID creates that physical change.

                    Now, what I think gives me pause is that I am
trying to understand the other cases that have been
referenced by the plaintiffs, and that is that smoke
damage is considered physical damage, persistent E. Coli
infestation is physical, gasoline vapors are physical,
carbon monoxide saturation is physical, and certainly

1    large quantities of asbestos in the air is considered

2    physical.

3          So I am just wondering whether or not COVID is

4    enough like these other things such that it should be

5    covered.

6          So that is sort of my thoughts, and let me

7    just start with Mr. Ferguson.

8          MR. FERGUSON:  Thank you, your Honor.  To

9    directly address your concerns here, I think there is an

10   important way we can view all of the cases you mentioned

11   of smoke damage, E. Coli, gas vapors, carbon monoxide,

12   and one way to view those cases is view the atmosphere

13   in the air within the insured property as part of the

14   physical premises of the property.  I think this is

15   exactly what the *Oregon Shakespeare* case does, which as

16   you mentioned the case of smoke infestation of the

17   *Oregon Shakespeare Festival*, and one way to think about

18   coronavirus, there is actually a contamination of the

19   air within the physical spaces that results in a change

20   on the molecular level of the composition of the air and

21   space.

22         What these cases hold is that when there is a

23   physical change or when there is a physical invasion of

24   a harmful substance that renders a space functionally

25   useless, you have direct physical loss of or damage to

3

1    property within insurance coverage.

2            And now, your Honor, I certainly sympathize

3    with your struggle over whether coronavirus is similar

4    enough to smoke, E. Coli, gas vapors, carbon monoxides,

5    and asbestos, but it does seem to me that those concerns

6    raise a factual question of what are the characteristics

7    of coronavirus?  How present was it on this premises?

8    How dangerous was it and what quantities?  Those are all

9    factual questions that can be addressed in discovery.

10            And with respect to the demurrer, the

11    defendants are making a legal point here.  They are

12    saying under no circumstances does our policy -- does

13    our insurance policy provide coverage for the insured in

14    the absence of tangible alteration to the property.

15            Now, I think as we point out in our brief --

16    and I won't belabor the point -- that is not actually

17    consistent with the language of their own policy, and

18    one of the primary interpretative goals in looking at

19    the insurance policy is you need to make sure that every

20    word in that policy makes sense.  You can't reach an

21    interpretation of a policy that renders superfluous

22    language.

23            To point out the obvious, defendant excludes

24    from coverage the mere presence of bacteria.  Now, that

25    exclusion only makes sense if it is against a backdrop

1    of damage that goes beyond tangible alteration of the
2    property.  There would be no reason to exclude the
3    presence of bacteria if the policy only covered tangible
4    alteration to property.

5          So, your Honor, I think that addressed your
6    concern, and I will leave it there for now.  I am happy
7    to speak more at length about other issues, but I will
8    leave it there for right now.

9          THE COURT:  Well, let me ask you another
10   question about that.  When I was struggling with the
11   smoke damage, gasoline vapors, et cetera, the
12   distinction in my mind -- and I don't know if this is
13   one that is valid or not, Mr. Ferguson -- the
14   distinction in my mind is that when California shut
15   down, when the Governor ordered us all to shelter in
16   place and businesses to close, it wasn't necessarily
17   because there was COVID at your hotels.  It was because
18   there was a fear that COVID might arrive at your hotels,
19   and there was a fear by having people move around the
20   state, that that would cause us all to infect each
21   other.

22         So even if we assume that COVID infects the
23   air, which I get your point on that, I think the science
24   supports you on that, but I guess the question I have
25   is, was that the cause?

MR. FERGUSON:  So, your Honor, to address your
concerns here, I think it is important to understand
that there are two independent possible sources of
coverage here.  The first is the business interruption
insurance coverage, which would be triggered by the
physical presence of coronavirus on the insured
premises.  That is our property, and that is what we
allege is our burden to prove that once we get into
discovery.

But I think on the allegations, we certainly
have met the requirements for the complaint that we have
alleged that there was coronavirus on the premises,
which caused physical loss of or damage to the premises.

The other independent source coverage that we
have under this policy is civil authority coverage, and
that doesn't require that there even be coronavirus on
our property.  It merely requires that there is direct
physical loss of or damage to property somewhere else,
and that the civil authority take action based on the
presence of coronavirus on another property.

Now the coronavirus is widespread in both of
the county orders.  The San Mateo County order and
Monterey County order mentioned there is coronavirus
virus within both of the counties.  They mention
specific case numbers.  They mention case numbers up in

the Bay Area.  It is clear in our mind that the local

county authority and the Governor are responding to the

physical presence of coronavirus in enacting the shelter

in place order.

And to underscore the point, this is about the

physical presence of coronavirus.  I think those orders

are designed to require people to avoid direct, physical

contact with the virus.  That is the key issue here.

150,000 people in this county have died because they

have come into physical contact with the virus.

I think that the virus is certainly physical,

and the orders are in response to the physical presence

of the virus that is at other locations and inside the

insured premises.

THE COURT:  Okay.  So let me make sure I am

understanding you.  So the business income is lost

because of the civil authority shutdown.  Doesn't that

also require a direct physical loss, and don't we still

come back to the same problem of whether or not COVID

causes a physical loss?

MR. FERGUSON:  Yes; that is correct, your

Honor.  To trigger the civil authority coverage, it is

our burden in discovery to show that there was

coronavirus on another property.

And what is interesting about the civil

1    authority coverage in this insurance policy is it is

2    written incredibly broadly.  Typically, in other civil

3    authority provisions, there is actually a proximity

4    requirement.  In our case, there actually is no such

5    proximity requirement.

6            So we believe that there was the physical

7    presence of coronavirus that caused a loss of or damage

8    to property essentially anywhere within two counties.

9    And as a result of that, the civil authority within the

10   county's order to ensure premises to be shut down.

11           So when you look at the claim for civil

12   authority in the context of this case and the context of

13   the policy that is in front of you, we think that we

14   sufficiently allege that there is direct physical loss

15   of or damage to other premises, and if we can carry that

16   burden after the demurrer in discovery, then we win this

17   case.

18           But I think all you have to do right now is

19   ask yourself, can the coronavirus cause direct physical

20   loss of or damage to any property?  And again, we would

21   submit that under the 16 cases we cited, the test is

22   whether there is a presence of a hazardous substance,

23   and whether the quantity of that substance renders the

24   property dangerous to human health and renders the

25   property unusable, we think that there is no tangible

8

1      alteration to the property required under this policy.

2              So our burden to invoke code civil authority

3      coverage is to show that somewhere within the County of

4      Monterey or the County of San Mateo that there was

5      coronavirus in such concentration that some property was

6      rendered uninhabitable or unusable because of the

7      concentration of coronavirus.  And we certainly think we

8      can meet that burden in discovery, but for now, the

9      Court has to merely analyze whether we alleged enough to

10     meet that bar.

11             THE COURT:  Thank you.  Mr. Keller?

12             MR. KELLER:  Yes, your Honor.  So I think that

13     your analysis is spot-on and exactly how you should be

14     looking at these issues.  So let me first address the

15     issue that gave you pause.

16             So the courts outside of California, as you

17     mentioned, got into issues like asbestos and carbon

18     monoxide, and those are, as you point out, ultimately

19     not just directed at losses.  It also needs to have the

20     business income loss be caused by that direct physical

21     loss.  Like the carbon monoxide situation, it's,

22     Everybody out of the building.  You are going to die

23     from carbon monoxide.

24             The asbestos, there is direct health problems.

25     There is a smell that is related to a lot of those

                                                              9

1    claims that you are referring to.  And so to have

2    everybody out of the building, that causes the business

3    income loss.

4          Here, the Court need not turn a blind eye to

5    the realities of the pandemic and the business situation

6    where the businesses are open while this pandemic is

7    still ongoing, and that's a result of the fact that it

8    is designed to keep people socially distanced and reduce

9    the spread of the pandemic, and that is why the the

10   shelter is in place so they don't prohibit access of

11   civil authority coverage requires to even allow the

12   hotels to keep people there, which they couldn't in the

13   case of a carbon monoxide, asbestos situation.

14         And further, those cases, again, are outside

15   of California.  The direct physical requirement as

16   prefix to the insurance agreement have to be considered

17   under the context for *MRI Healthcare*, and *MRI Healthcare*

18   says that it's excluded and accompanied by demonstrable

19   physical alteration of the property.

20         So I believe that when you follow the analysis

21   of the policy language under the California case in *MRI*

22   *Healthcare*, that it is not a business income loss caused

23   by direct physical damage to property, and the plaintiff

24   has certainly not alleged that.  At most, they've

25   alleged a physical presence on the property of the virus

1     and not that that has caused the business income loss,

2     nor can they because as I noted, they could have had

3     people there.  They chose to cease and close down based

4     on the counties' orders, and that was the cause of their

5     loss.

6            THE COURT:  Well, let me just correct you.  I

7     don't think they chose to shut down.  They were ordered

8     to shut down.

9            MR. KELLER:  Yes.  They followed the shelter

10    in place orders, and they -- what I meant by that was

11    there was some level of operations that they could have

12    had under the county order such as maybe economically

13    disadvantaged individuals that they still could have

14    provided shelter to.  To completely shut down was not a

15    complete mandate by the counties.

16           But irrespective of that finer point, there is

17    no direct physical damage to property that caused the

18    business income loss.

19           THE COURT:  Well, Mr. Ferguson, I completely

20    disagree with Mr. Keller that anyone had a choice.  I

21    think we were all trying to follow the orders we were

22    given, but in spite of that issue, having looked at the

23    *MRI* case -- and I certainly agree with your

24    representation that once you get to the facts of the *MRI*

25    and the ramping up, the ramping down and all that, it

1          really is not at all like our case here.

2                   However, I do think -- and help me with this,

3          Mr. Ferguson -- I do think the *MRI* case is intended to

4          be the framework by which we analyze these cases, and

5          that case pretty much says that because of the need for

6          a physical damage, that it precludes any claim in which

7          the insured suffered a detrimental economic impact

8          without the distinct, demonstrable physical alteration

9          of the property.  Help me out with that, Mr. Ferguson.

10                  MR. FERGUSON:  Yes.  So a couple points on

11         *MRI*, your Honor.  First, the term 'physical, as the *MRI*

12         court understands it is, losses that are intangible or

13         incorporeal.  That is what it is using to distinguish

14         against physical, and I don't think that we alleged an

15         intangible or incorporeal loss here.

16                  We allege there are specific, physical

17         microbes within our property that are contaminating the

18         air that are hazardous to human health that are

19         rendering it unusable.  And I think to adopt the

20         definition of direct physical loss of or direct physical

21         damage to property, that it excludes the situation where

22         you have an invasion by a physical force into the

23         atmosphere of your property onto all the surfaces of

24         your property and says that is not direct physical loss

25         of or damage to property, it can't be the case.

1          When an insured purchased insurance, they are

2     expecting that when there is a physical catastrophe that

3     shuts down their operation, the insurance coverage will

4     kick in and cover that, and I think that to the extent

5     that *MRI* case suggests that there has to be tangible

6     alteration in the sense that it is perceptible to the

7     eye or to touch, that is simply dicta in that case.

8     This Court is not required to follow *MRI Healthcare* on

9     that rationale.

10          *MRI Healthcare* actually could have said what

11    we are saying here.  It could have said physical damage

12    actually does include the physical invasion by hazardous

13    substances that renders a property unusable, and the

14    outcome would have been exactly the same in *MRI*

15    *Healthcare*, and I am pointing that out to say that

16    discussion of the meaning of direct physical loss of or

17    damage to property wasn't central.

18          One other point about *MRI Healthcare* is the

19    language of coverage in that case and the relevant

20    policy is actually different.  The language of coverage

21    in that policy, direct physical loss to or damage to

22    property.  In our case, it is direct physical loss

23    of...property, and we think that difference in language

24    is critical as we have suffered a direct physical loss

25    of our property because it's been invaded, contaminated,

1    polluted by the hazardous substance that renders it

2    unfit for human use, and the government saw the same

3    hazard was present and ordered us to shut down our

4    operations as a consequence of that.

5         And, your Honor, I think you previously had

6    characterized the shutdown orders as requiring people to

7    distance.  And while that is part of the orders, they

8    actually do go further than that, and this is critical.

9    This is paragraph three of the Monterey order:  All

10   businesses within the facility in the county except

11   essential businesses are required to cease all activity

12   at facilities located within the county.  That is a

13   direct shutdown and a closure of our business that

14   prohibits access to the business, which we think is

15   enough to trigger the civil authority coverage.

16        Mr. Keller has made the point that there were

17   very specific uses that we could have made about

18   properties under these orders.  We could have sheltered

19   homeless people and possibly allowed a limited number of

20   individuals to use the hotel as a residence.

21        What he is trying to do is read into the civil

22   authority provision in our policy of requiring that

23   there be a total prohibition of access to the insured

24   premises.  Well, that word 'total' doesn't actually

25   appear in our insurance policy.  All it says is the

14

1    government prohibits access to your premises and has

2    done so as a consequence of a direct physical loss of or

3    damage to the properties elsewhere, then insurance

4    coverage kicks in.

5              I hope that addresses your concerns about *MRI*,

6    your Honor.

7              THE COURT:  It is helpful.  Thank you.

8    Mr. Keller, anything you would like to close with?

9              MR. KELLER:  Yes, your Honor.  So at the end

10   of the day, the virus, whether it is present on the

11   property or not, does not cause the business income

12   loss, which it is required to under the policy, and it

13   is not a direct physical loss as -- not a direct

14   physical damage to property as described by *MRI*

15   *Healthcare*.

16             And at the end of the day, they cannot allege

17   that there was a direct physical damage to property that

18   was, in fact, the cause of their business income loss.

19   Thank you.

20             THE COURT:  Any last words, Mr. Ferguson?

21             MR. FERGUSON:  Yes, your Honor.  Thank you.

22   One last word is, I would urge the Court to reread *Ward*,

23   which is the other case that California Mutual cites

24   with the idea that you need a tangible alteration.

25             But what is critical in the *Ward* case is that

1    you have to analyze the scope of coverage within the
2    context of the claims that are asserted.  And so, you
3    know, language that might appear unambiguous in the
4    context of one particular claim might eventually appear
5    ambiguous in the context of another claim.
6           So the two cases the defendant cites, *Ward* and
7    *MRI*, are in such different factual circumstances of
8    their own that I think, given the claims that we are
9    asserting, the scope of the coverage within the policy
10   has to be viewed within the lens of the claims that we
11   are asserting.
12          And given the claims that we are asserting, I
13   think that the insurance policy is, at a minimum,
14   subject to two reasonable constructions.  One is that as
15   the defendants assert that there has to be physical
16   alteration to the property.  The other is the
17   construction.
18          We think this is a reasonable interpretation,
19   and given the Court's struggle with how to resolve this
20   case, we think it's clear that reasonable minds can
21   differ on this.  If that is the case, the tie goes to
22   the plaintiff as ambiguities are construed in favor of
23   the insured.
24          And, your Honor, one last point.  California
25   Mutual actually has a virus exclusion that they include

in other policies. We raised this in the complaint. In fact, in their reply, they cite the *Michigan* case where the insurance policy issue in that case also had a virus exclusion. This is a well-known exclusion that is included in many, many, many policies throughout the country, and many of the cases in the wave of COVID litigation in the last few months are going to be decided on that virus exclusion angle.

Our client has dutifully paid almost $40,000 a a year in insurance premiums to California Mutual under a policy that does not have a virus exclusion. This is critical, your Honor. The fact that California Mutual and the insurance industry at large has a virus exclusion very strongly suggests to us that they believe a virus -- the presence of a virus can cause direct physical loss of or damage to property. That was not included in this policy.

California Mutual very easily could have tacked on the word 'virus' using a comma after the word 'bacteria' in the bacteria exclusion. They could have included the presence of virus from the insurance policy, and they failed to do so.

So California Mutual having failed to define the central term in this case, direct physical loss of or damage to property, and having failed to include a

```
 1      virus exclusion, we think the Court should adopt the
 2      plaintiff's very reasonable construction of this
 3      insurance policy and find that our allegation that there
 4      is physical presence of coronavirus and hazardous
 5      concentration on our property is sufficient to trigger
 6      business income interruption insurance coverage, as well
 7      as the fact that there is coronavirus-inhabited
 8      concentration on other properties triggered the
 9      government to close our facilities.
10              Or in the alternative, we are also entitled to
11      civil authority coverage.  And I think with that, your
12      Honor, we would submit.
13              THE COURT:  All right.  The Court is going to
14      take this under submission.  It seems to me that if the
15      Court decides to sustain the demurrer, that the motion
16      to strike is moot, so I don't want to hear argument on
17      that.
18              Anyway, I just want to spend more time
19      thinking about it, and I appreciate your thoughtful
20      argument.  If for any reason I decide that I need
21      additional argument, I will let you know, but otherwise,
22      I hopefully will be able to let you know very soon.
23      Thank you.
24              MR. FERGUSON:  Thank you, your Honor.
25              MR. KELLER:  Thank you, your Honor.
```

```
 1              MR. FERGUSON:  Should there be any additional

 2      briefing or legal issues you should like us to address,

 3      we would be happy to do so.

 4              THE COURT:  This is Mr. Ferguson talking?

 5              MR. FERGUSON:  I am sorry.  Mr. Ferguson, yes,

 6      your Honor.

 7              THE COURT:  Thank you very much.

 8              (Whereupon, the proceedings adjourned at 9:55

 9              a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1    STATE OF CALIFORNIA      )

 2                             ) SS.

 3    COUNTY OF MONTEREY        )

 4

 5            I, Jamie L. Setterquist, an official reporter

 6    for the Superior Court of the State of California, in

 7    and for the County of Monterey, do hereby certify:

 8            That, as such reporter, I reported

 9    stenographically the above proceedings on Monday, August

10    4, 2020, and that the above and foregoing transcript,

11    consisting of pages numbered from 1 to 19, inclusive,

12    contain a true and correct transcript of all of said

13    proceedings.

14

15            Dated at Salinas, California, this August 7,

16    2020.

17

18

19                        _____
                          JAMIE L. SETTERQUIST  CSR 13362
20                        OFFICIAL COURT REPORTER

21

22

23

24

25
```

JAMIE L. SETTERQUIST  CSR 13362